## THOMAS v. CAPITAL TRANSIT CO.

## RITZ CAB CO. v. CAPITAL TRANSIT CO.

### Nos. 1107, 1108.

Municipal Court of Appeals for the
District of Columbia.

Argued Sept. 5, 1951.

Decided Oct. 3, 1951.

Rehearing Denied Oct. 26, 1951.

Nathan L. Silberberg, Washington, D. C., for appellants.

George D. Horning, Jr., Washington, D. C., with whom Frank Roberson, Washington, D. C., was on the brief, for appellee.

Before CAYTON, Chief Judge, and HOOD and CLAGETT, Associate Judges.

CAYTON, Chief Judge.

Alvin L. Thomas, a taxicab driver, sued Capital Transit Company for personal injuries sustained in a collision between his cab and defendant's streetcar. Ritz Cab Company also filed suit for damages to the taxicab. The charge was that the streetcar was operated negligently and in violation of law. The transit company filed answers denying negligence, the two cases were consolidated and tried by jury, and at the close of all the evidence the trial court directed a verdict for defendant. Plaintiffs appeal.

Plaintiffs' evidence was in substance that the cab was going north on Third Street, N. W., and entered the intersection of Pennsylvania Avenue on a green light at a speed of about 20 miles an hour. When

within the intersection, the streetcar shot across his path. The cab driver applied his brakes and swerved to the left, but the front of the cab was struck by the streetcar. Defendant did not deny that its car entered the intersection against a red light; its defense was that the accident was unavoidable because the motorman had suddenly and without warning lost consciousness prior to the collision.

The motorman testified that he was on a trip from the Navy Yard to Colorado Avenue; that the trip was in every way normal and routine until he got to the Peace Monument which the tracks circle just before entering Pennsylvania Avenue in a westerly direction. He said he remembered coming around Peace Monument but remembered nothing else until after the accident. He said that he had no recollection of anything that happened after reaching Peace Monument and traveling to Third Street (a distance stipulated to be 820 feet). He said his memory ceased and he was in a complete blank or "blackout" until after the accident. The first thing he could remember was sitting on the step of the streetcar. He said, "I can't describe how I felt, but I just — I couldn't — I couldn't see." He was taken to a hospital in an ambulance and said his first period of any clear recollection or perception was when he was in the hospital. He testified that up until the time he lost consciousness he had absolutely no feeling of physical disability or warning that anything unusual was about to happen to him. He could recall no other time in his life when he lost consciousness or fainted, and testified that so far as he knew the general state of his health the day of the accident was good.

Also called to testify were three passengers on the streetcar. As was to be expected, the details of their testimony did not dovetail in every particular, but they did in general support the motorman's testimony that he had lost consciousness before reaching Third Street. One of the passengers said he heard a woman call out and that he looked up and saw the operator slumped over the controls, and that this happened just a few feet past Peace Monument. Another passenger said she heard a woman scream and looked up and saw the operator slump over, and after that she saw the taxicab approaching and then the crash occurred. A third passenger said that he heard a woman scream when the streetcar had "almost" reached Third Street, obviously before the crash. This witness said he ran forward, found the motorman slumped backward, shook him and tried to get his right foot off the power pedal, but his foot was "frozen" to the pedal. He managed to free the foot from the pedal, mashed his own foot down on the emergency brake, "threw everything out of control," and the car finally stopped. By that time the streetcar had struck the plaintiff's cab as well as another cab. A lady passenger came forward and wiped blood off the motorman's face where it had struck the dash in front of him, and he was placed on the streetcar step where he remained in a dazed condition, unable to do more than mutter incoherently, until he was taken by ambulance to the hospital.

The question is whether the evidence recited was of such a nature as to require submission to the jury. We think the answer has been given in Cohen v. Petty, 62 App.D.C. 187, 65 F.2d 820, 821, where on strikingly similar facts the trial court directed a verdict for defendant and on appeal it was held that such ruling "was in all respects correct." The only real difference between that case and this is that there it was an operator of a private automobile who fainted. In an opinion by Judge Groner, the court said: "It is undoubtedly the law that one who is suddenly stricken by an illness, which he had no reason to anticipate, while driving an automobile, which renders it impossible for him to control the car, is not chargeable with negligence. Armstrong v. Cook, 250 Mich. 180, 229 N.W. 433; Slattery v. Haley, Dom.Law Rep., 1923 (3), p. 156." The opinion went on to point out that the positive evidence was that the driver did not know and had no reason to think he would be subject to an attack of fainting or unconsciousness and hence no negligence could be charged to him. We have no

doubt that that decision governs this case. Here as there the positive testimony was that without any previous warning the operator fainted and lost control of his senses and that the collision followed. In addition to the cases cited in Cohen v. Petty, later cases in other jurisdictions have taken the same view. Weldon Tool Co. v. Kelley, 81 Ohio App. 427, 76 N.E.2d 629; Thayer v. Thayer, 286 Mich. 273, 282 N.W. 145; LaVigne v. LaVigne, 176 Or. 634, 158 P.2d 557. Directly in point is Beiner v. Nassau Electric R. Co., 191 App.Div. 371, 181 N.Y.S. 628, 629. There the motorman of a streetcar became ill and "fell senseless on the floor of his car," and the uncontrolled car ran on and caused damage. This was called an "act of God," and the carrier was freed of liability.

With these precedents to guide us and viewing the evidence in a light most favorable to plaintiffs, we must hold that there was no substantial evidence from which the jury could have found that the motorman's "blackout" occurred so short a time before the collision that some act of the motorman rather than his "blackout" was the proximate cause of the accident. Three witnesses supported the motorman's testimony, or tended to support it in some or all particulars, and pieced out the complete story of how the accident happened. No witness said that the motorman did not faint and none said that such fainting did not precede the crash by an appreciable period of time.

We now consider three separate arguments for reversal advanced by appellants. First, they say that they were entitled to go to the jury on the question of whether defendant company was negligent in permitting the motorman to take his car on this particular trip. The motorman revealed on cross-examination that he had asked permission of one of the clerks to take the afternoon off and was refused. But his testimony was that he did not recall saying anything about not feeling well; he merely asked if he could get off if the clerk had any extra men available for duty. This, standing alone, was far too vague a theory on which to predicate liability.

The same is true of appellants' claim that during his cross-examination the motorman was shown to have been mistaken or forgetful as to certain periods of sick leave he had taken in the past. They were too remote in nature and time to permit the jury to speculate that they had any reasonable connection with his fainting on the day of the accident.

Likewise we can give no weight to appellants' contention that an emergency or "deadman" switch on the streetcar was not operating properly. It was explained that a motorman was to keep his left foot on such switch and that it would go into operation when his left foot was removed from it. The meager evidence on that point is susceptible of the interpretation that the switch did not operate because, having stiffened when he lost consciousness, the motorman's left foot was frozen to it just as his right foot was frozen to the power pedal. There was no direct evidence as to any defect in the switch or how or why it failed to operate, if it did fail. Moreover, we note that though this matter was gone into by appellants' counsel by interrogatories in advance of trial, he brought forth nothing of a substantial nature at the trial, and the matter was allowed to rest in the cloudy form we have mentioned.

Finally appellants say, with neither argument nor citation to support the statement, that defendant should have produced the testimony of the physician who treated the motorman after the accident. In effect they contend that an inference is to be drawn against the defendant because of its failure to produce such medical testimony. The record in the Cohen v. Petty case, supra, reveals that the same thing happened there: defendant did not produce the doctor who treated him after the crash. Plaintiff, in his brief on appeal, made a point of that fact; but the court apparently gave it no weight and did not discuss the contention in its opinion.

Looking at the evidence as a whole, we think we must rule as was done in the Cohen case that, "Even if plaintiff's own evidence tended more strongly than it does to imply some act of negligence, it would be

insufficient to sustain a verdict and judgment upon proof such as the defendant offered here of undisputed facts, for in such a case the inference must yield to uncontradicted evidence of actual events."

Affirmed.